UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 24-cr-00197 (ECT)

___

United States of America,

        Plaintiff,

vs.

Lucas Mathew Kramer,

        Defendant.

**DEFENDANT'S SENTENCING MEMORANDUM**

___

## INTRODUCTION

Defendant Lucas Kramer, through counsel, respectfully submits the following position regarding sentencing pursuant to U.S.S.G. §6A1.2 and Local Rule 83.10. For reasons set forth below, Mr. Kramer respectfully requests the Court grant a downward variance, as the advisory guidelines range are unsuitable and unjustifiably high for his offense. According to the United States Sentencing Commission, Courts sentence below the guideline range in the overwhelming majority of non-production possession offender cases. A downward variance is warranted here for the following reasons: Mr. Kramer's lack of criminal record, his remorse and acceptance of responsibility, his strong family and community support, his proactive completion of evaluations and treatment, and comparatively low amount of possessed pornographic material.

## THE SENTENCING GUIDELINES

### I. THE GUIDELINES ARE ADVISORY

Mr. Kramer agrees with the Pre-Sentence Report (PSR) criminal history section and guidelines calculations. They will not be recited here because they are well detailed in the plea agreement, PSR, and mitigation report. The sentencing guidelines are advisory and the Court, in its wisdom and discretion, may sentence as it deems fit in accordance with the circumstances.

1

*United States v. Booker*, 543 U.S. 220, 245 (2005). The Guidelines are "effectively advisory," and a court is permitted "to tailor the sentence in light of other statutory concerns" listed in 18 U.S.C. § 3553. *Id*. "Guidelines are not only ***not*** mandatory on sentencing courts; they are also ***not*** to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350 (2009) (emphasis added).

Mr. Kramer moves for a variance from the calculated guidelines range pursuant to 18 U.S.C. § 3553(a). The District Court may consider the specific circumstances of both the defendant and the crime in determining the proper sentence and decide whether a downward variance from the sentencing guidelines is appropriate. *United States v. Rivera*, 439 F.3d 446, 448 (8th Cir. 2006). This is to ensure that sentences are "sufficient, but not greater than necessary," to effectuate the purpose of sentencing. 18 U.S.C. § 3553(a). A variance is a sentence which is imposed outside of the applicable guideline range, based on the statutory sentencing factors found in 18 U.S.C § 3553(a). As explained by the Ninth Circuit:

> A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently triggered by a prosecution request to reward cooperation . . . or by other factors that take the case "outside the heartland" contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense. A "variance," by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. §3553(a).

*United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) (citing *United States v. Cruz-Perez*, 567 F.3d 1142, 1146 (9th Cir. 2009)).

**II. MOST COURTS BELIEVE §2G2.2 IS TOO SEVERE AND THEREFORE GRANT DOWNWARD VARIANCES**

The sentencing guidelines for child pornography offenses have become increasingly harsh over time, resulting in unreasonably lengthy sentences for defendants with zero criminal history. Because enhancements initially intended to target more serious offenders apply in most cases (i.e.

use of a computer, or low thresholds for "number of images" to trigger enhancements), the average guideline minimum and average sentence imposed for non-production child pornography offenses has increased over the past two decades. *See* Federal Sentencing of Child Pornography Non-Production Offenses, United States Sentencing Commission at 5 (June 2021).

Section 2G2.2 is "a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with § 3553 requires." *U.S. v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010). "As courts and the government contend with the **outdated** statutory and guideline structure, sentencing disparities among similarly situated non-production child pornography offenders have become increasingly pervasive." *See* Federal Sentencing of Child Pornography Non-Production Offenses, United States Sentencing Commission at 7 (June 2021) (emphasis added).

Downward variances are not a fanciful concept rarely applied in possession-only child pornography case. "[C]ourts increasingly apply downward variances in response to the high guideline ranges that apply to the typical non-production child pornography offender." *Id*. at 5. In fiscal year 2019, the sentences for 119 similarly situated possession offenders ranged from **probation** to 228 months though these offenders had the same guideline calculation through the application of the same specific offense characteristics and criminal history category. *Id* at 7. The average sentence for these possession offenders was 47 months, with the **overwhelming majority (81.5%) sentenced below the guideline range**. *Id*. at 54-55. Less than one-third (30%) of non-production child pornography offenders received a sentence within the guideline range. The majority (59.0%) of non-production child pornography offenders received a variance below the guideline range. Non-government sponsored below range variances accounted for 42.2 percent of sentences imposed, and government sponsored below range variances accounted for 16.8 percent.

3

**The long-term trend shows that most courts believe §2G2.2 is generally too severe and does not appropriately measure offender culpability in the typical non-production child pornography case**. *Id*. at 22 (emphasis added).

Cracking down on child pornography and taking a hard stance against offenders is a position few will reject at first glance. It is morally popular to align with any viewpoint protecting children, and for good reason. But the ever-expanding crusade to curb child pornography is precisely what caused these enormous sentencing disparities. The apex bad actors are those who produce child pornography and directly exploit children through kidnapping, sexual assault and abuse. A desire to eliminate those bad actors makes sense, but possession-only offenders bear the brunt since most cases are possession cases, not manufacturing cases. As the thinking goes: "There will no longer be child pornography if people do not view it." This is analogous to giving a lengthy prison sentence to a drug addict who purchases a personal quantity of drugs (a hit) and is caught. There is obviously a crime committed by possessing drugs, but putting away a single "user" does not eliminate all drug purchasing and certainly does not erase the nation's drug epidemic. In Mr. Kramer's case, he has no criminal history and has never abused a child, solicited a child, or engaged in the production of child pornography, yet he faces an advisory guideline range of 97-121 months (approximately 8-10 years in prison). Sentencing in this case requires surgical precision, rather than broad-stroke assumptions or yielding to raw emotional responses over the substance and nature of the offense.

## SECTION 3553 SENTENCING FACTORS

18 U.S.C. §3553 governs and guides the Court's sentencing determination. *See Gall v. United States*, 552 U.S. 38, 46 (2007) (clarifying that 18 U.S.C. §3553(a) is the controlling law of sentencing, and the Sentencing Guidelines are merely advisory). Section 3553(a) directs that

the Court should impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in that section. Ultimately, the Court must "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify,the crime and punishment to ensue." *Gall*, 552 U.S. at 46.

**I.      MR. KRAMER'S POSSESSED MATERIAL WAS LOWER THAN AVERAGE**

In fiscal year 2019, non-production child pornography offenses involved a **median** number of 4,265 images, with some offenders possessing and distributing **millions** of images and videos. *See* Federal Sentencing of Child Pornography Non-Production Offenses, United States Sentencing Commission at 4 (June 2021). Mr. Kramer possessed a total of 2,599 images but this number is interpretative, not literal. He actually possessed 49 images and 34 videos, but one video is equal to 75 images accordingly to the guideline comments. This calculation evolved over time and for reasons that will not be explored here. The takeaway is twofold: first, the guidelines have become increasingly harsher and arguably arbitrary – leading to astronomical guideline sentences for non-contact, non-production, possession-only offenses; and second, Mr. Kramer's actual volume of possessed pornography is far lower than average. Comparatively, especially to offenders possessing literally millions of images and videos, Mr. Kramer's culpability is much lower.

**II.     THE PSYCHOSEXUAL EVALUATION AND RECOMMENDATIONS**

Mr. Kramer's personal history is well documented in the PSR and mitigation report and therefore will not be restated here. This memorandum instead focuses on the significance of Mr. Kramer's gained insight and his low risk for reoffending,

    **a. Mr. Kramer has insight many defendants never achieve.**

To Mr. Kramer's credit, he has taken significant steps to address the underlying reasons for this offense. It may seem unusual for a person charged with possession of child pornography

to **not** be sexually attracted to minors, but this is precisely the case with Mr. Kramer. His consistent comments of not being sexually attracted to minors seems like a deflection, until the psychosexual evaluation and treatment letter are reviewed. The psychosexual evaluation evidenced no indications of somatic/cognitive, thought, interpersonal, behavioral, or emotional dysfunction" but results were consistent with elements of an obsessive-compulsive disorder.[1] The evaluation described Mr. Kramer as a "viewer" and "trader" of pornography as opposed to a producer or someone who is contact-driven. The social context of Mr. Kramer's habitual viewing and trading of pornography includes a decline in his intimate relationships and a history of hypersexual drive as well as feeling socially inadequate. His pornography use accelerated when he struggled with sexual intimacy in his marital relationships, and his compulsive traits have accelerated his prolific collection of pornography. Mr. Kramer's possessed child pornography as a "commodity" when interacting with others on social platforms, not to satisfy any sexual desire towards children. As further evidence suggesting Mr. Kramer is not sexually attracted to minors, the psychosexual explains the various traits commonly found in child contact offenders. These include never marrying, using child pornography for more than two years, volunteering in places where minors are present, and engaging in online sexual communications with a child. None of these apply to Mr. Kramer.

Through psychotherapy, Mr. Kramer addressed the decisions leading to his behavior, largely stemming from passivity, conflict avoidance, and the suppression of personal needs. He sought out pornographic content to facilitate sexual arousal and curiosity, and traded content for social interaction to satiate his own needs. When Mr. Kramer started psychotherapy, he initially showed little understanding to why he committed this offense or the risk factors contributing to it.

---

[1] Psychosexual Evaluation dated September 4, 2024, by Gerald Henkel-Johnson, Psy.D., Licensed Psychologist (attached).

6

According to his psychotherapist's report, "that has since changed dramatically" and that he is "receptive to treatment." Mr. Kramer articulates an understanding of the seriousness of his offense and the impact it has on children. He absorbed the victim impact statements and is processing what led him to commit this crime, with dramatic changes and improvements noted by his therapist. The only way a defendant can learn and fix the underlying cause of their behavior is to first understand and accept what the root cause is. Mr. Kramer has clearly demonstrated that acceptance, understanding, and showcased a genuine desire to change.

    **b. Mr. Kramer is a low risk for reoffending.**

According to the most recent United States Sentencing Commission's data and statistics, the overall recidivism rate of the 1,093 non-production child pornography offenders was 27.6 percent (302 of 1,093 offenders) three years after release from incarceration (or the commencement of probation). Of the 1,093 offenders, 16.0 percent were arrested for a crime that was not a sex offense or related to the offender's status as a sex offender (depicted as "general recidivism" in Figure 31). The sexual recidivism rate for all non-production child pornography offenders was 4.3 percent (47 of the 1,093 offenders). An additional 7.3 percent of offenders were arrested or had their term of supervised release revoked for failing to register as a sex offender.

The recidivism numbers for offenders like Mr. Kramer are already low: less than one-third of those released from probation or incarceration reoffend in some capacity. According to Mr. Kramer's psychosexual evaluation, his risk for reoffending is low. "Based on research, psychological testing, and interviewing, my professional opinion places Mr. Kramer in a group of child pornography offenders whose risk of progressing to contact offending is low. Also, his risk for violent offending (sexual and nonsexual combined) is low."[2] According to Mr. Kramer's

---

[2] Psychosexual Evaluation dated September 4, 2024, by Gerald Henkel-Johnson, Psy.D., Licensed Psychologist.

psychotherapist: "Mr. Kramer has been receptive to treatment. He demonstrates a high level of metacognitive ability, a willingness to address his reoffending and maladaptive behaviors, and a motivation to improve the dynamics within his relationship."[3] While no evaluation or assessment can guarantee any defendant will not reoffend, Mr. Kramer took the initiative to address the underlying issue causing his offense. He sought out psychotherapy and has made great strides to date in learning why he offended, and what steps he must take to eliminate the chances of recidivism.

### III. NEED FOR ADEQUATE DETERRENCE

Empirical evidence concludes there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28- 29 (2006). ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); Stephen Weisburd *et al*., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate*

---

[3] Treatment letter dated January 31, 2025, from Saprina Matheny, MSW, LICSW, Psychotherapist (attached).

*the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (variations in sentence length "have no detectable effect on rates of re-arrest").

The U.S. Sentencing Commission found "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." United States Sentencing Commission, *Measuring Recidivism: The Criminal History*. As a practical matter, a sentence of **any** duration is significant for any human being – but especially for Mr. Kramer, who has not served any incarceration period to date beyond post-arrest detention. This case has already profoundly impacted Mr. Kramer's life. Granting a variance below the guideline range will still provide deterrent as any sentence within the guidelines range.

Collaterally and additionally, Mr. Kramer faces punishment outside the Court. He must register as a predatory sex offender and be subject to the stringent rules and requirements differing for each state. Any misstep in registration, even without mal intent, can and likely will lead to a new felony criminal charge. In the court of public opinion, Mr. Kramer was convicted upon arrest and remains cautious simply existing in his community because of veiled online death threats. In his personal life, Mr. Kramer disappointed his friends, his wife, his family, and himself. While often unmentioned, there is a permanent shame he now carries for the remainder of his life. Mr. Kramer cannot erase this shame, but he can – and has – made strides toward rebuilding faith in himself and earning trust from his supporters.

## IV.   MR. KRAMER HAS A STRONG SUPPORT NETWORK

Mr. Kramer is fortunate to have a strong network of supportive family and friends, as evidenced by the thoughtful and articulate letters submitted to the Court. Too often criminal defendants stand alone at sentencing, with no support beyond their attorney. A robust and

supportive network plays a pivotal role in mitigating the likelihood of reoffending by providing emotional resources fostering resilience and personal accountability. The emotional support and social capital offered by Mr. Kramer's family and friends can (and will) enhance his sense of self-worth, reduce feelings of alienation, and promote prosocial behavior. His friends and family are a form of social control, where he is held accountable for his actions. It is one thing for Mr. Kramer to let himself down, but an entirely separate and more painful burden to know he let down those closest to him. He has taken positive and significant steps to right his wrongs, in and out of court, but those steps are just the beginning of his long journey toward redemption.

## V.     MR. KRAMER HAS ONGOING HEALTH CONCERNS

As well articulated in the mitigation report, Mr. Kramer has battled Crohn's disease, of both small and large bowel, since 1999. He is currently in a medically induced remission solely because of his medications. Mr. Kramer requires this medication every 7 weeks and there is a noticeable decline in his health within 1 week of missing those medications. Any delay or break in infusions causes Mr. Kramer to needlessly suffer. As noted by his provider, stopping or restarting medications can result in worsening symptoms and the development of antibodies to a medication meaning the medication is no longer working appropriately. Incarceration poses a substantial and significant risk to Mr. Kramer's health that can be easily avoided and treated outside of prison walls.

## **CONCLUSION**

Mr. Kramer has been on home detention since his release from custody on July 19, 2024. He demonstrated complete compliance with all conditions to date with zero violations. This not only shows Mr. Kramer can, and will, abide by all court orders, but also shows how he will constructively spend his time out of custody. He found and maintained employment despite his

charges and pending sentencing, and voluntarily sought the professional help needed to address the underlying cause of the offense. Mr. Kramer has demonstrated over the past 8 months that he is extremely amenable to treatment and will not squander the opportunity to be on home detention.

Therefore, Mr. Kramer respectfully requests the Court grant a downward variance and sentence him to 365 days of home detention with GPS monitoring, completion of 2,000 hours of community service, and any additional condition the Court deems appropriate. As discussed, and in summary, the advisory guidelines range here grossly outweighs a just punishment for Mr. Kramer's offense. Placing him on home detention with GPS monitoring achieves several ends. First, it allows Mr. Kramer to continue earning income to pay restitution in a timely manner, something he cannot pay if incarcerated – or at least at a reasonable pace. Second, it allows Mr. Kramer to continue with psychotherapy, engage in sex offender treatment, and build upon the insight and progress made thus far. This rehabilitation is critical to strengthening the needed foundation and skills for Mr. Kramer to understand why he offended, and more importantly, to give him the requisite skills to not reoffend. Lastly, it creates an enormous incentive for Mr. Kramer to remain law-abiding while also giving back to his community. The Court can always send Mr. Kramer to prison, for any misstep. Granting his sentencing request is not a gift, nor is it a "free pass" for his offense. Rather, it is an opportunity to balance a need for correction with rehabilitation while reserving the option for a harsher punishment. Such a sentence is sufficient but not greater than necessary to comply with the purposes set forth in Section 3553.

Dated: March 7, 2025                             Respectfully submitted,

                                                 **Keyser Law, P.A.**

                                                 /s/ Christopher Keyser
                                                 Christopher Keyser (0389361)
                                                 400 South Fourth Street, Suite 310M
                                                 Minneapolis, MN 55415
                                                 Phone: (612) 338-5007
                                                 Fax: (612) 454-2775
                                                 Email: chris@keyserdefense.com